# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5392 | **DATE** | February 26, 2002 |
| **CASE TITLE** | Boudreau, et al. v. Ryan, et al. (consolidated with White v. Patla - 01 C 806) | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

| | | |
|---|---|---|
| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| S(9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry   This cause is hereby dismissed for lack of standing. Plaintiffs' motion for a preliminary injunction [ ] is denied. Enter Memorandum Opinion. [102-1] |
| (11) | x | [For further detail see order (on reverse side of/attached to) the original minute order.] |

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| X | Notices MAILED by judge's staff. | | |
| | Notified counsel by telephone. | FEB 28 2002 date docketed | 117 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to _____ | | |
| KAM | courtroom deputy's initials | date mailed notice | |
| | | KAM mailing deputy initials | |

Date/time received in central Clerk's Office

(Reserved for use by the Court)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

EDWARD BOUDREAU, by and through          )
his parents, Edwin and Ann               )
Boudreau, BRIAN BRUGGEMAN, by and        )
through his parents Kenneth and          )
Carol Bruggeman, FRANCES CORSELLO,       )
by and through her parents,              )
Vincent and Agnes Corsello, ANGELA       )
MOORE, by and through her parents,       )
James and Brenda Moore, LINDA            )
SEMPREVIVO, by and through her           )
parents, Richard and Ruth Ann            )
Semprevivo, individually and on          )
behalf of a class,                       )
                                         )
                    Plaintiffs,          )
                                         )
        v.                               )      No. 00 C 5392
                                         )
GEORGE H. RYAN, in his official          )
capacity as Governor of the State        )
of Illinois, ANN PATLA, in her           )
official capacity as Director of         )
the Illinois Department of Public        )
Aid, LINDA RENEE BAKER, in her           )
official capacity as Secretary of        )
the Illinois Department of Human         )
Services, MELISSA WRIGHT, in her         )
official capacity as Associate           )
Director of the Office of                )
Developmental Disabilities,              )
                                         )
                    Defendants.          )

DOCKETED
FEB 28 2002

**MEMORANDUM OPINION**

Before the court is the defendants' challenge to the
plaintiffs' standing to bring this lawsuit. For the reasons
explained below, we find that the plaintiffs do not have standing.

117

**BACKGROUND**

**Procedural History**

The plaintiffs are developmentally disabled adults who reside with their parents but seek Medicaid-funded residential placement. They brought this suit alleging that the defendants' policies and practices violate various provisions of the Medicaid statute, the Rehabilitation Act, and the Americans with Disabilities Act (ADA). In addition, they present equal protection and due process claims.

This court dismissed the ADA claim in May of 2001, see Boudreau v. Ryan, No. 00 C 5392, 2001 WL 840583 (N.D. Ill. May 2, 2001), but denied the defendants' motion to dismiss the other claims. The plaintiffs then filed a motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(2). Following briefing and oral arguments, the plaintiffs amended the complaint to add four new class representatives: Douglas Wilsman, Leah Jones, Christine Auer, and Sharon Lowrey.[1] The defendants continued to object to class certification on the basis that the plaintiffs lack standing to sue and do not satisfy the criteria set forth in Rule 23(a). We held an extensive evidentiary hearing on these issues. Near the end of the hearing, the plaintiffs sought to withdraw their motion for class certification. But it was still necessary to finish the hearing in order to resolve the threshold question of standing. In fact,

---

[1] This is reflected in the Third Amended Complaint.

the bulk of the evidence introduced at the hearing bore upon that issue.[2]

## Services At Issue

Medicaid is a cooperative federal-state program under which states receive federal funding to provide health care to low-income individuals. State participation in the Medicaid program is voluntary, but if a state elects to participate it must comply with the requirements of Title XIX and applicable regulations. Alexander v. Choate, 469 U.S. 287, 289 n. 1 (1985). The state must submit to the Secretary of the United States Department of Health and Human Services (HHS) a State Plan which enumerates what services it will provide under the Medicaid program.

There are two types of residential Medicaid services at issue here: intermediate care facilities for the mentally retarded ("ICF/MR" or "ICF/DD")[3], and community integrated living arrangements (CILA). An ICF/MR is "an institution for the mentally retarded or persons with related conditions," the primary purpose of which is to provide health or rehabilitative

---

[2] The plaintiffs also moved to file a fourth amended complaint to reflect the claims they raised during the hearing, including Medicaid's requirement that services be provided in a manner that is in the best interest of recipients and that recipients have freedom of choice in providers. See 42 U.S.C. §§ 1396a(a)(19) and (23). In view of the fact that the defendants addressed these provisions during the hearing and were clearly prepared to respond to them, we allowed the plaintiffs to amend the complaint to conform with the proof.

[3] Under Illinois regulations, "ICF/MR includes ... intermediate care for the developmentally disabled." 59 Ill. Adm. Code, Chapter I, Part 120.10. The defendants contend that ICFs/DD are private facilities licensed as ICFs/MR. While all ICFs/DD are ICFs/MR, not all ICFs/MR are ICFs/DD. This distinction does not appear to be material to the issues before the court, and we will use the terms interchangeably.

services for its residents. See 42 U.S.C. § 1396(d). The state of

Illinois has adopted a State Plan that includes services in an

ICF/MR, and the defendants admit that individuals found eligible

for ICF/DD services are entitled to these services. Pre-admission

screening (PAS) agents[4] located throughout the state determine an

individual's eligibility for ICF/DD services and refer them to

placement options.

In the event ICF/DD services are unavailable, the plaintiffs

in this case seek residential placement in CILAs, which Illinois

regulations define as

> A living arrangement provided by a licensed community
> developmental disabilities services agency where eight
> or fewer individuals with a developmental disability
> reside under the supervision of the agency.
> Individuals receive a customized array of flexible
> habilitation or personal care supports and services in
> the home, in day programs and in other community
> locations under the supervision of a community support
> team within the local agency.

59 Ill. Adm. Code, Chapter I, Part 120.10. CILA services are not

ordinarily covered by Medicaid funding. To provide funds under

the Medicaid program, states must apply to the Secretary of HHS

for a "waiver" of certain Medicaid requirements. Illinois applied

for and was granted a waiver under the home and community-based

waiver ("HCBW") program to provide services ("waiver services"),

---

[4] The Illinois Administrative Code defines PAS agents as
Community agencies or units of local government selected by the
Department to act as agents of the Department in carrying out
certain federal and State requirements related to the assessment,
determination of eligibility, and arrangements for Medicaid-funded
services and supports for individuals with a developmental
disability.
59 Ill. Adm. Code, Chapter I, § 120.10.

including CILA care, to individuals who are eligible for and would otherwise require ICF/MR level care. Generally, the twin goals of the waiver program are to avoid institutionalization of the disabled and to provide a cost-effective alternative to placement in ICFs/DD.

The defendants argue that there is no entitlement to CILA services. Due to limited resources, the state has capped the number of individuals who may receive waiver services under the HCBW program to 8,250 slots. The Illinois Department of Human Services (DHS) has fashioned priority placement guidelines with the goal of providing CILA care to individuals who, in its judgment, have the most compelling needs for community residential placement funded by Medicaid. For example, CILA placement is provided to developmentally disabled individuals who would otherwise require institutionalization when their care-givers die, become disabled themselves, or become abusive. The procedure for obtaining CILA services begins with the PAS agents, which assess an individual's eligibility and needs. Requests for CILA placements are then handled through a centralized system at the DHS, where Network Facilitators review the proposed placements presented by the PAS agencies, and determine who fits within the priority placement guidelines.

The plaintiffs argue that despite their requests for residential Medicaid services, they have been unable to obtain ICF/DD placement. They introduced evidence showing that the

defendants have adopted a plan to move Illinois' residential system away from an ICF/DD model and toward a more community-integrated model exemplified by CILA care. To carry out this plan, the defendants' policy is to prevent providers from developing new ICFs/DD and to encourage existing ICFs/DD to close, downsize, or convert to CILAs. The evidence at the hearing showed that the defendants implemented these policies before conducting any inquiry into the demand for ICF/DD services.[5] In the plaintiffs' view, these policies have contributed to a shortage of ICF/DD vacancies in the nine northeastern counties of the state: Cook, DuPage, Lake, Will, Grundy, Kankakee, Kane, Kendall, and McHenry counties. The plaintiffs argue that the shortage has caused the plaintiffs and other eligible individuals to be unable to find appropriate ICF/DD placement. When such individuals seek residential Medicaid services in the form of CILA care, however, the defendants refuse to fund available CILA placements[6] on the ground that waiver services are not entitlements and funding is only available in emergency situations.

The defendants defend the state's right to make the policy choice to move the system away from the institutional approach

---

[5] The DHS is now conducting a survey of consumers to identify needs and desires for ICF/DD placement.

[6] There is a distinction between a vacancy in a CILA home and a CILA funding slot. Even if a CILA home has a vacancy, funding for that placement is contingent on an individual meeting the priority placement guidelines and being approved for funding by the DHS. Tr. 2220-2225 (testimony of Melissa Wright). The evidence showed that there are unfunded vacancies in CILA homes in the Chicago area. Id.

represented by ICF/DD care and toward a more community-integrated model. While ICF/DD vacancies are more difficult to find in the northern part of Illinois, vacancies are readily available in downstate Illinois. The defendants argue that the plaintiffs' failure to find placement is not due to a critical shortage of ICF/DD vacancies, but due to the geographic choice to which they have limited their search. They argue that the plaintiffs have no standing to bring this case because there is no federal right to residential Medicaid placement within geographic proximity to the recipient's family home.

## **Analysis**

We begin with the fundamental principles of standing.

The Constitution confines the federal judicial power to "Cases" or "Controversies." U.S. Const. Art. III, § 2. Implicit in that limitation is the requirement that the party invoking the court's jurisdiction have standing. Arizonans for Official English v. Arizona, 520 U.S. 43, 64, 117 S.Ct. 1055, 1067, 137 L.Ed.2d 170 (1997); Gillespie v. City of Indianapolis, 185 F.3d 693, 701 (7th Cir.1999), cert. denied, 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000). Broadly speaking, standing turns on one's personal stake in the dispute. See Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978). In order to establish that interest, the plaintiff must show that: (1) she has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992); Gillespie, 185 F.3d at 701.

Kyles v. J.K. Guardian Sec. Services, Inc., 222 F.3d 289, 293-94
(7th Cir. 2000). The party invoking federal jurisdiction bears
the burden of establishing the elements of standing, see Lujan v.
Defenders of Wildlife, 504 U.S. 555, 561 (1992), and "[w]here
standing is challenged as a factual matter, the plaintiff bears
the burden of supporting the allegations necessary for standing
with 'competent proof.' " Retired Chicago Police Ass'n v. City of
Chicago, 76 F.3d 856, 862 (7th Cir. 1996). "Competent proof"
requires a showing by a preponderance of the evidence that
standing exists. Id.; NLFC, Inc. v. Devcom Mid-America, Inc., 45
F.3d 231, 237 (7th Cir. 1995).

Each of the plaintiffs, Doug Wilsman, Leah Jones, Sharon
Lowrey, and Christine Auer, requested services from their local
PAS agent (through their parents) for the purpose of finding
residential Medicaid placement. Each is eligible for ICF/DD and
CILA level of care.[7] Christine and Sharon began searching for

---

[2/] We reject the defendants' contention that Christine is not eligible for
ICF/DD or CILA level of care. The defendants do not challenge the PAS agent's
determination that Christine is developmentally disabled, that she does not need
a nursing facility, and that she does need an "active treatment" program.
Therefore, Christine satisfies the substantive criteria for ICF/DD eligibility.
See Pl's Ex. Vol. II, DD. To the extent that the Notice of Determination does not
reflect this conclusion with a check in the appropriate box, it is simply a
clerical error by the PAS agency. Any argument that the failure to check the
ICF/DD box reflected a decision that Christine would not benefit from ICF/DD
level of care is belied by the eleven referrals the PAS agent made to ICF/DD
providers on Christine's behalf from 1992 through 2001. See Pls. Ex. Vol. I, A.

Similarly, we reject any argument that Sharon Lowrey has no standing
because she has not been found financially eligible for Medicaid. The PAS agent
may only conduct a search for ICF/DD placement if the applicant is on Medicaid
or is Medicaid-eligible. The evidence is clear that Sharon will receive Medicaid
benefits once she accumulates enough medical bills to meet her monthly "spend
down" of $127. See Tr. at 2318-19 (testimony of Vilma Torres). At the time she
applied for Medicaid, Sharon was not in an ICF/DD placement and did not have any
medical bills, so she did not qualify for a Medicaid card. However, the monthly
cost of ICF/DD placement being over $3,000, it is beyond question that Sharon

placement in 1994, Doug began searching for placement in 1998, and Leah in 1999. Because Medicaid funding for ICF/DD placement is contingent upon a referral from the PAS agent, the families requested the PAS agent to send referral packets to several ICFs/DD. None of the plaintiffs found ICF/DD placement.

As to three of the plaintiffs, Doug, Sharon, and Leah, the evidence shows that none refused to authorize the sending of a referral packet to any provider, and none refused to explore any potential vacancy suggested by the PAS agent. With respect to Christine, the evidence shows that the family did not investigate one vacancy opportunity recommended by the PAS agent. The Qualified Mental Retardation Professionals (QMRPs) from the PAS agents who worked with Doug, Sharon, and Leah testified at the hearing, and opined that the three plaintiffs had followed their recommendations and conducted diligent searches for ICF/DD placement. On the other hand, Lois Brown, the QMRP who worked with the Jones and Lowrey families opined that neither was in a great hurry to obtain placement for Leah or Sharon. Indeed, there is some evidence that Sharon's parents are interested in placing Sharon two to five years in the future. Janice Prunier-King, the QMRP who worked with Doug's family, testified that she was unable to locate a vacancy at an appropriate facility for him, which in her opinion is a small (16-beds or fewer) ICF/DD north of highway I-80. Wilsman was denied CILA funding, despite Prunier-King's

will spend down $127 per month when she is placed in an ICF/DD and will be issued a Medicaid card. Id.

strong recommendation to the DHS that Doug's family was in urgent
need of residential placement.

The evidence is clear that each of the plaintiffs will only
accept a placement in a geographic area that will allow frequent
family visitation. For example, the parents of Leah Jones
testified that they would not accept a facility more than one
hour's drive from their home; the mother of Doug Wilsman
testified that she would accept a placement no more than three
hours away from her home; the mother of Christine Auer testified
that she would accept a placement within a thirty mile radius of
her home; and the mother of Sharon Lowrey testified that she
preferred a placement in Elgin, Illinois but would consider a
placement as far as 45-minutes away from her home.[8] Indeed, the
plaintiffs argued throughout the hearing that ICF/DD placement
should be provided in the communities in which they reside.

The injury, therefore, is not an inability to find ICF/DD
placement at all, but to find it in the desired geographic
proximity to the plaintiffs' family homes. Originally, this
problem was framed as an inadequacy in the number of vacancies in
the nine-county area. The plaintiffs acknowledge, however, that
there are about 18 ICF/DD vacancies in the nine-county area at
any given time. While that is not a great number of vacancies,
there is no showing that any of the plaintiffs applied for any of

---

[8] It is no criticism of these parents to observe that they all requested
services within a particular geographic area. As several witnesses testified, the
very decision to place an adult child in a residential setting is one that can
be extremely stressful to a parent.

the available slots or that the placements themselves are inappropriate.[9] Also, there is no dispute that there are many more ICF/DD vacancies in downstate Illinois and that none of the plaintiffs is interested in applying for or accepting any of those vacancies.

Therefore, the first issue the court must decide is whether plaintiffs have a federal right to be placed in a residential facility located at what they deem an acceptable distance from their family home. See Lewis v. Casey, 518 U.S. 343, 350-51 (1996) (identifying the underlying right at issue and stating that the harm alleged must pertain to that right); Lujan, 504 U.S. at 560 (defining injury as "an invasion of a legally protected interest"). If they have such a right, then additional

---

[9] The evidence presented as to the availability of ICF/DD services was, on the whole, unsatisfactory. Plaintiffs' evidence included the opinions of a number of providers, PAS agents, and even employees of the DHS that there is a shortage of ICF/DD vacancies in the nine-county area. But defendants presented witnesses who offered contrary opinions. What the court needed in order to decide between these conflicting opinions was some hard evidence. The plaintiffs did offer evidence that between January 1, 1999 and June 30, 2001 there were 378 individuals seeking residential Medicaid placement in the Chicago area who were unable to obtain it. But the evidence was not persuasive because it did not show that the failure to obtain placement was due to a lack of vacancies rather than the individuals' preferences, self-imposed limitations on their search, or behavioral or medical problems which required special treatment. Testimony about waiting lists turned out to have little probative value. Evidence which initially seemed impressive was the testimony of plaintiffs' witness Steven Zider, Associate Executive Director of Community Alternatives, Ltd. (CAU), a PAS agency. Dr. Zider produced a list of 249 adults with developmental disabilities who, he said, had requested CAU to find immediate residential placement and for whom placements could not be found. The defendants examined the CAU files pertaining to these individuals and were able to show that in almost every case the individual was not seeking immediate placement or was restricting his or her search to particular facilities or to particular geographic areas.

On the other hand, the defendants' evidence that ICF/DD placements are readily available was compromised by counting dubious vacancies - such as vacancies which the facility is holding open for a particular individual or group of individuals.

As indicated in the text, however, these deficiencies in the evidence are ultimately immaterial, because there is no disagreement that there are vacancies both in the metropolitan area and downstate for which the plaintiffs have not applied.

questions are whether the defendants' plan, policies, or practices violate that right and whether any judgment of this court would provide plaintiffs an effective remedy.

## I.   Right to Placement In Geographic Proximity

The plaintiffs assert that their right to an ICF/DD placement in geographic proximity to their homes arises under various sections of the Medicaid statute, including the "reasonable promptness" provision, 42 U.S.C. § 1396a(a)(8), the "statewideness" provision, § 1396a(a)(1), the "comparability" provision, § 1396(a)(10)(B), the "freedom of choice" provision, § 1396a(a)(23), and the "best interest" provision, § 1396a(a)(19). In addition, they argue that their rights arise under federal regulations and an agency theory.

To determine the defendants' obligations under Medicaid, we begin by reviewing the principles underlying Spending Clause legislation.

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.  The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." See Steward Machine Co. v. Davis, 301 U.S. 548, 585-598 (1937); Harris v. McRae, 448 U.S. 297 (1980). There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.  Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously. Cf. Employees v. Department of Public Health and Welfare, 411 U.S. 279, 285 (1973); Edelman v. Jordan, 415 U.S. 651 (1974). By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.

Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 17 (1981) (holding that the Developmentally Disabled Assistance and Bill of Rights Act did not require the state to provide 'appropriate treatment' in the 'least restrictive environment' to mentally retarded individuals). Applying these principles to this case, we find nothing in the Medicaid provisions cited by the plaintiffs to suggest that Congress intended to require the states to provide ICF/DD placement within geographic proximity to the plaintiff's family home.

### A. Reasonable Promptness

Under the Medicaid Act, the State Plan must provide that "medical assistance ... shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). The parties dispute whether this provision means that the defendants actually have to provide ICF/DD placement to eligible individuals, a position supported by Doe v. Chiles, 136 F.3d 709 (11th Cir. 1998) and Benjamin H. v. Ohl, No. 3:99-0338, 1999 U.S. Dist. LEXIS 22469 (W.D. Va. July 15, 1999), or whether it means that the defendants need only provide payment for ICF/DD services the plaintiffs find, a position supported by the definition of "medical assistance" as "payment of part or all of the cost" of "services in an intermediate care facility for the mentally retarded." 42 U.S.C. § 1396d(a)(15). We need not resolve the dispute because, regardless of the answer, there is nothing in the "reasonable promptness" provision or the regulations addressing it that suggests even remotely where such "medical

assistance" must be provided. Therefore, this provision is irrelevant to the plaintiffs' position that they have a right to ICF/DD placement within three hours, one hour, thirty miles, or 45 minutes from their homes.

### B.  Statewideness

The State Plan for medical assistance must "provide that it shall be in effect in all political subdivisions of the State, and, if administered by them, be mandatory upon them." 42 U.S.C. § 1396a(a)(1).

Plaintiffs argue that this "statewideness" provision means that they have a right to placement in geographic proximity to their families' homes. The plaintiffs point out that fully two-thirds of the state's population resides in the nine-county region, where only one-third of the ICFs/DD are located.[10] The plaintiffs argue that the defendants' policies perpetuate this lack of proportionality in a way that violates the statewideness requirement. Apart from encouraging existing ICFs/DD to downsize or convert to CILAs, the plaintiffs point out that it is the defendants' policy to suppress the growth of ICFs/DD by refusing to provide letters of support to providers wishing to develop ICFs/DD. Without letters of support from the DHS, providers cannot obtain permission to build ICFs/DD from the Illinois

---

[10]  The evidence was consistent that developmental disabilities are evenly distributed throughout populations, and there is no reason to believe that these disabilities occur more frequently in the southern part of the state than in the nine-county area.

Health Facilities Planning Board (IHFPB). For example, in May of
2001, defendant Melissa Wright denied a request by Joe Wesbrook,
an ICF/DD provider, to develop an additional ICF/DD for community
persons because the state is currently using its resources to
develop CILAs. Indeed, Wright testified that the DHS's strategic
plan over the next ten years is to de-institutionalize Illinois
by building more CILAs and closing more ICFs/DD; she expressed a
strong disinclination to allow more ICF/DD development because
such facilities would only be converted to CILAs in the future.
Three other providers located in the nine-county area testified
that they would develop ICFs/DD if the DHS would allow it.

In support of their argument that the state's policies
violate federal law, the plaintiffs cite <u>Sobky v. Smoley</u>, 855 F.
Supp. 1123 (E.D. Cal. 1994). In that case, California adopted a
practice allowing counties to determine whether and in what
amount to provide Medi-Cal-funded methadone treatment services.
<u>Id.</u> at 1126. Several counties opted out of providing methadone
treatment services. Although the state's policy prohibited
participating counties from refusing to serve non-residents if
there was funding and space available, at least two counties
nevertheless imposed residency requirements. <u>Id.</u> at 1129.
Reviewing the regulations[11] interpreting section 1396a(a)(1),

---

[11]/    (b) State plan requirements. A State plan must provide that the
following requirements are met:
    (1) The plan will be in operation statewide through a system of
    local  offices,  under  equitable  standards  for  assistance  and
    administration that are mandatory throughout the State.

    (2) If administered by political subdivisions of the State, the plan
    will be mandatory on those subdivisions.

Sobky concluded that the statewideness provision means that
services actually have to be provided in all areas of the state,
and not simply that the state must provide access to offices for
eligibility determinations and other administrative processes.
Id. at 1134-35. Sobky concluded that § 1396a(a)(1) is enforceable
under § 1983 and that California's plan allowing counties to opt-
out of providing an entitlement service violated federal law.

Sobky, however, is distinguishable from this case. Sobky
addressed the second clause of the statewideness provision, which
requires that the terms of the State Plan must apply to all
political subdivisions administering the State Plan. There is no
contention here that any counties (or other political
subdivisions charged with administering the Medicaid program)
have refused to provide a service the state agrees to provide in
its plan. Instead, the plaintiffs contend that there is a

---

(3) The agency will ensure that the plan is continuously in
operation in all local offices or agencies through--
    (i) Methods for informing staff of State policies,
    standards, procedures, and instructions;

    (ii) Systematic planned examination and evaluation of
    operations in local offices by regularly assigned State
    staff who make regular visits; and

    (iii) Reports, controls, or other methods.

(c) Exceptions.
    (1) "Statewide operation" does not mean, for example, that every
    source of service must furnish the service State-wide. The
    requirement does not preclude the agency from contracting with a
    comprehensive health care organization (such as an HMO or a rural
    health clinic) that serves a specific area of the State, to furnish
    services to Medicaid recipients who live in that area and chose
    (sic) to receive services from that HMO or rural health clinic.
    Recipients who live in other parts of the State may receive their
    services from other sources.

42 C.F.R. § 431.50.

shortage of ICF/DD vacancies in the nine-county area and the state is aggravating the problem by interfering with the market. Sobky did not address a shortage of services in the market at large but the state's failure to require that entitlement services be provided in every county of the state.

Moreover, the plaintiffs' challenge is not limited to the lack of available ICF/DD beds in the nine-county area - they challenge the failure to provide services within specific geographic limits they individually define as "appropriate." In other words, it would not be sufficient that an ICF/DD bed is available within the nine-county area - or within their own counties for that matter - if the facility is more than one hour, 45-minutes, three hours, or thirty miles from their homes. As one would expect - and as the various positions of the plaintiffs illustrate - these limits are subjective notions of how far is "too far" from the family home. The fundamental problem with the plaintiffs' claim is that nothing in the statewideness requirement nor the regulations contains any directive that services must be provided within any particular distance from the family home, much less any directive that the state provide services in a geographic area that meets subjective notions of appropriate proximity. We do not believe that any requirement that depends on such subjective and elastic notions of proximity can create a federal right. See Pennhurst, 451 U.S. at 17-18; Blessing v. Freestone, 520 U.S. 329, 340-41 (1997) (stating that a statutory provision cannot give rise to a federal right if it

is "so 'vague and amorphous' that its enforcement would strain judicial competence").

Finally, this case is also different from <u>Sobky</u> in the type of services at issue. At issue here are residential placements that serve individuals whose level of impairments are diverse and who require a wide range of treatments and services. Unlike treatment slots available in a methadone program, ICF/DD vacancies are not fungible. A setting that is appropriate for one moderately retarded applicant may be inappropriate for applicants who have more profound levels of retardation, or who require treatment for seizures, or who need to develop job skills in the community. Private ICF/DD[12] providers have an interest in selecting an applicant for placement who is compatible with the population the facility is already serving. For example, Doug Wilsman was rejected from Sheltered Village (the only ICF/DD provider in his county) because his high level of functioning was considered an inappropriate match for that particular ICF/DD. We do not believe the Medicaid statute imposes upon the state the onerous burden of ensuring that appropriate ICF/DD services for each needy and eligible applicant will be available within every political subdivision of the state. That would require the state to maintain a number of diverse ICF/DD vacancies in every

---

[12]    The ICF/DD system in Illinois is primarily run through private providers who have no obligation to accept any individual referred by the PAS agents. The public facilities — State Operated Developmental Centers (SODCs) — are generally a last resort, appropriate for individuals who are a danger to themselves or others. <u>See</u> Hoskins Ex. 1, § 1000.40 (IV) (detailing the criteria for admission to an SODC).

locality. Nothing in the statewideness provision itself or in the regulations suggests that the state signed on to such a broad obligation.

Therefore, we hold that the statewideness provision does not establish the plaintiffs' right to placement in geographic proximity to their family homes.

### C. **Comparability**

Next, the plaintiffs argue that the state is violating Section 1396a(a)(10)(B) because the availability of ICFs/DD in the Chicago area is not comparable to the availability of ICFs/DD in downstate Illinois. Section 1396a(a)(10)(B) requires the State Plan must to provide

> that the medical assistance made available to any individual described in subparagraph (A) -
>
>> (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and (ii) shall not be less in amount, duration or scope than the medical assistance made available to individuals not described in subparagraph (A).

42 U.S.C. § 1396a(a)(10)(B). This section creates an equality principle by which all categorically needy individuals[13] must receive medical assistance which is no less than that provided to

---

[13] Section 1396a(10)(A) refers to "categorically needy" individuals. With few exceptions, individuals who meet the "income and resource requirements" for some other form of government aid are considered categorically needy. Lewis v. Thompson, 252 F.3d 567, 570 (2nd Cir. 2001). "Medically needy" individuals are persons whose income exceeds financial eligibility standards, but who qualify for financial assistance for medical expenses if they "spend down" their income to the requisite level. Atkins v. Rivera, 477 U.S. 154, 157 (1986).

any other categorically or medically needy individual. <u>Sobky</u>, 855 F.Supp. at 1139 (holding that this section is enforceable under § 1983).

The parties agree that finding an ICF/DD placement in downstate Illinois is easier than finding it in the Chicago area.[14] The plaintiffs argue that this is a violation of the comparability requirement because eligible individuals residing in the northern part of the state have less access to ICF/DD facilities near their family homes. We do not read the comparability provision so broadly. By its very terms, the comparability section addresses only the "amount, duration, or scope" of the medical assistance provided by the state. The statute is silent on the question of geographic proximity.

While one case has suggested that the comparability requirement means services should be uniformly available from county to county, the case did not address the more problematic issues presented by residential care facilities that serve a population of individuals with specialized and diverse needs. <u>Cf.</u> <u>Clark v. Kizer</u>, 758 F. Supp. 572, 580 (E.D. Cal. 1990), <u>aff'd in part, vacated in part</u>, <u>Clark v. Coye</u>, 967 F.2d 585 (9th Cir.

---

[14] According to the defendants' own numbers, there were only 41 vacancies in the nine-county area on December 31, 2001, while there were 175 vacancies downstate. <u>See</u> Declaration of Stephen Rudolph, Tab B & C. The plaintiffs argue that there were only 18 vacancies in the nine-county area as of that date, and 115 vacancies downstate. <u>See</u> Parties' 12/31/01 Reconciliation of Statewide Vacancies. It is unnecessary to resolve the conflict. Our point here is simply that the parties agree there are many more vacancies in downstate Illinois than in the nine-county region.

1992) (discussing dental services).[15] Moreover, <u>Clark</u> does not explain how the language of the comparability provision makes clear to the state that it is obligated to ensure availability of services uniformly in all parts of the state as a condition of receiving federal funds.

We find that the comparability provision does not contain a clear statement that the state is obligated to ensure that ICF/DD services are uniformly available in every part of the state or in geographic proximity to the plaintiffs' family homes.


### D.   Freedom of Choice

The freedom of choice provision states:

> any individual eligible for medical assistance
> (including drugs) may obtain such assistance from any
> institution, agency, community pharmacy, or person,
> qualified to perform the service or services required
> (including an organization which provides such
> services, or arranges for their availability, on a
> prepayment basis), who undertakes to provide him such
> services.

42 U.S.C. § 1396a(a)(23). The plaintiffs argue that the defendants' policy of refusing to allow ICF/DD providers to develop new facilities violates the plaintiffs' freedom to choose their providers. The heads of four ICF/DD providers testified that they have approval from their Boards of Directors to develop residential Medicaid facilities, including ICFs/DD in the nine-

---

[15] The <u>Sobky</u> case addressed the comparability provision in the context of the state's failure to fund methadone treatment for all categorically needy individuals who are eligible for treatment. 855 F. Supp. at 1140. The issue here, by contrast, is not the unavailability of funding, but the scarcity of vacancies in a particular geographic area of the state.

county area. These include: Joe Wesbrook, Executive Director of
Garden Center for the Handicapped; Lynn O'Shea, Executive
Director of Association for Individual Development ("AID");
Dennis Trybus, Executive Director of Helping Hand Rehabilitation
Center; and James Hogan, President and Chief Executive Officer of
Cornerstone Services. These witnesses testified that they would,
in fact, develop ICFs/DD if the DHS would grant them letters of
support to do so.[16] Three of the plaintiffs, Christine, Leah,
and Sharon, applied to AID, and Christine additionally applied to
Helping Hand. They were all rejected because of insufficient
vacancies, and/or because the providers prefer to serve
individuals within a particular community, or because the
applicant was not in an emergency situation. See Pls.' Ex. Vol.
I, A - C.

We agree that the freedom of choice provision obligates the
state to fund the placement of eligible individuals at an ICF/DD
that has accepted him or her. See O'Bannon v. Town Court Nursing
Center, 447 U.S. 773, 785 (1980) (stating that the freedom of
choice provision was intended to give individuals "the right to
choose among a range of *qualified* providers without government
interference"). However, none of the four plaintiffs have been
denied funding at an ICF/DD that has accepted them for placement.

---

[16] The defendants argue that ICFs/DD may grow by as much as 10% without
the approval of the IHFPB, and these facilities have not attempted to grow by
10%. The reason for this was made clear by Wesbrook, who testified that adding
another bedroom to his existing ICF/DD home would be more problematic than
building another ICF/DD home. He is currently licensed as a 16-bed and under
facility; to increase the number of residents in his ICF/DD he would need another
license and would have to meet the additional regulations pertaining to a full-
scale institution.

Instead, the plaintiffs argue that the freedom of choice

provision entitles them to choose placement in facilities that do

not currently exist. The freedom of choice requirement is not so

broad. Cf. Kelly Kare Ltd. v. O'Rourke, 930 F.2d 170, 178 (2nd

Cir. 1991) (stating that "a Medicaid recipient's freedom of

choice rights are necessarily dependent on a provider's ability

to render services").

Plaintiffs' freedom of choice argument encounters additional

problems discussed by the Supreme Court in Warth v. Seldin:

> When a governmental prohibition or restriction imposed
> on one party causes specific harm to a third party,
> harm that a constitutional provision or statute was
> intended to prevent, the indirectness of the injury
> does not necessarily deprive the person harmed of
> standing to vindicate his rights. E.g. Roe v. Wade, 410
> U.S. 113, 124 ... (1973). But it may make it
> substantially more difficult to meet the minimum
> requirement of Art. III: to establish that, in fact,
> the asserted injury was the consequence of the
> defendants' actions, or that prospective relief will
> remove the harm.

422 U.S. 490, 505 (1975). There are vacancies in the nine-county

area and additional vacancies downstate to which the plaintiffs

have not applied for placement. It is not valid to attribute the

plaintiffs' failure to find ICF/DD placement to the state's

policy regarding the de-institutionalization of residential

Medicaid services. See id. at 508 (holding that "a plaintiff who

seeks to challenge exclusionary zoning practices must allege

specific, concrete facts demonstrating that the challenged

practices harm him").

Moreover, "[t]he remedy must of course be limited to the inadequacy that produced the injury." Lewis, 518 U.S. at 357. It would be speculative to conclude that an injunction preventing the state from enforcing its policies would cause providers to develop new facilities that the plaintiffs would find acceptable and that would accept the plaintiffs for placement. See Warth, 422 U.S. at 506 (noting that the record failed to show that two housing projects identified by the petitioners "would have satisfied petitioners needs at prices they could afford, or that, were the court to remove the obstructions attributable to respondents, such relief would benefit petitioners").

Therefore, we conclude that the freedom of choice provision does not create a right to choose non-existent services, and in any event, that the plaintiffs have not shown they meet the other elements of standing as to this claim.

### E.    Best Interest

The Medicaid statute requires the State Plan to provide that "such care and services will be provided in the manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19). Apart from the fact that the phrase "best interests" is an amorphous concept, this provision contains no clear directive that the state is required to provide ICF/DD services within geographic proximity to the plaintiffs' family homes. Indeed, forcing the state to do so

would certainly compromise the "simplicity of administration" counseled by the statute.

### F. Regulations

The plaintiffs also claim that their right to ICF/DD placement in close proximity to their family arises out of two regulations. One regulation requires that each resident of an ICF/MR receive an

> active treatment program, which includes aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services ... that is directed toward the acquisition of the behaviors necessary for the [resident] to function with as much self-determination and independence as possible and the prevention or deceleration or regression or loss of current optimal functional status.

42 C.F.R. § 483.440(a). The plaintiffs introduced expert testimony from Dr. Susan Parish that family participation in the life of a developmentally disabled individual plays an extraordinarily important role in helping achieve better mental health, emotional health, and even physical health outcomes. Those who have limited social supports are more likely to experience depression and other mental illness, and to develop behavioral problems. The federal regulations recognize the need for family participation. See 42 C.F.R. § 483.420(c)(1) (stating that the ICF/MR must "promote participation of parents (if the client is a minor) and legal guardians in the process of providing active treatment unless their participation is unobtainable or inappropriate"); § 483.420(c)(3) (stating that

facilities are required to "promote visits by individuals with a
relationship to the client (such as family, close friends, legal
guardians and advocates) at any reasonable hour, without prior
notice"); § 483.420(c)(5) (stating that facilities must "promote
frequent and informal leaves from the facility for visits, trips
or vacations"). The plaintiffs point out that another regulation
specifically requires family participation in developing an
Individual Program Plan for the ICF/DD resident. The regulation
states that "[p]articipation by the [resident], his or her parent
(if the client is a minor), or the client's legal guardian is
required unless that participation is unobtainable or
inappropriate." 42 C.F.R. § 483.440(c)(2).

There is no doubt that family participation in the life of a
developmentally disabled individual residing in an ICF/DD is
extremely salutary. Dr. Parish's testimony also confirmed the
common sense conclusion that close proximity to the family home
can be one of the most important factors contributing to family
involvement in the life of an ICF/DD resident. However, the above
regulations set conditions for ICF/MR providers to participate in
the Medicaid program; they do not impose obligations on the state
to facilitate family involvement by providing ICF/DD placement in
close proximity to the family home. To divine such a requirement
out of these regulations would not only be a stretch, but
ultimately futile, as this court cannot begin to imagine how to
measure "close proximity to the family home" in this context.
More to the point, the state cannot be expected to know what it

is required to do under the plaintiffs' interpretation of the regulations. To echo the <u>Pennhurst</u> refrain once more, these regulations establish no clear duty on the part of the state to provide residential Medicaid placement within any particular geographic distance from the family home.

### G.    Agency

Finally, the plaintiffs argue that the state is bound to provide ICF/DD placement in the geographic area recommended by its own PAS agents. The issue arises in the case of Doug Wilsman, whose PAS agent determined that due to his high level of functioning, a placement in a small facility of 16-beds or less would be appropriate for him, and that because of the desirability of frequent family visitation, it would inappropriate to place him south of highway I-80. The plaintiffs point to a portion of the state's Procedures Manual For Developmental Disabilities Pre-Admission Screening Agencies in support of their position:

> The role of the DD PAS agency is to ensure compliance
> with applicable Federal and State laws, arrange for and
> conduct assessments, make necessary determinations
> regarding eligibility for services, educate individuals
> and families, and make referrals and provide linkage to
> appropriate and needed services. <u>The PAS process will
> prevent inappropriate admissions</u> to long term care
> facilities (nursing facilities and Intermediate Care
> Facilities serving persons with Developmental
> Disabilities [ICFDDs]) and inappropriate enrollments in
> waiver programs.

Hoskins Ex. 1 at § 020.00 (emphasis added).

In the context of Spending Clause legislation, § 1983 can only be used to vindicate federal rights infringed by a state policy or practice. <u>Mallett v. Wisconsin Div. of Vocational Rehabilitation</u>, 130 F.3d 1245, 1253 (7th Cir. 1997). The plaintiffs have not articulated any federal right to placement in an area or facility determined appropriate by an agent for the state. The only source of right to which they have referred is the Procedure Manual itself, but the plaintiffs cannot use § 1983 to enforce the state's Procedure Manual. <u>See</u> <u>Mallett</u>, 130 F.3d at 1254 (holding that plaintiff failed to state a claim under § 1983 where he alleged that the state agency violated its own procedures in closing his file); <u>Concourse Rehabilitation and Nursing Ctr. v. Wing</u>, 150 F.3d 185, 188-89 (2nd Cir. 1998) (holding that the plaintiff failed to state a federal claim where it alleged a misapplication of the State Plan instead of a conflict between a state plan or practice and a federal mandate). In any event, the Procedure Manual also contains another section which specifically provides that the "DD PAS agency may <u>not</u> make recommendations regarding where services and supports must be provided, or by what provider(s)." <u>See</u> Hoskins Ex. 1, § 1000.20 (emphasis in original).

## II.  <u>Remedy</u>

The preceding sections of this opinion have focused primarily on the question of whether the plaintiffs have articulated a legally protected interest in receiving residential

Medicaid services in close proximity to their family homes.
Answering the question in the negative, we have touched from time
to time on the problem of fashioning a remedy even if there were
such a right. In response to a question we posed during final
arguments, plaintiffs' counsel suggested that the appropriate
remedy would be for the court simply to order the defendants "to
come up with a plan ... to provide services with reasonable
promptness addressing issues of comparability." Tr. at 3246-47.
An injunction of that nature would leave the defendants in a
quandary as to what they are required to do. It would pass off to
them a question the plaintiffs are themselves unable to answer.
Enforcement of such an injunction through contempt proceedings
would be impossible. "Holding a party in contempt is only
appropriate if the court can point to a decree from the court
which sets forth in specific detail an unequivocal command which
the party violated." United States v. Berg, 20 F.3d 304, 310 (7th
Cir. 1994).

The plaintiffs' reliance on Doe v. Chiles, 136 F.3d 709, is
misplaced. In that case, the Eleventh Circuit enjoined the state
of Florida from failing to provide ICF/DD placements within 90
days to individuals on the state's waiting list. Id. at 711. The
Eleventh Circuit was guided not only by the statute, section
1396a(a)(8), but by regulations addressing the meaning of
"reasonable promptness." By contrast, geographic proximity is an

amorphous concept not contained, defined, or addressed anywhere in the statute or regulations.

## CONCLUSION

Nothing in the Medicaid statute or the regulations imposes a clear obligation on the state to provide ICF/DD services in close proximity to the plaintiffs' family homes. Because the concept of geographic proximity is entirely subjective, it would be impossible to enforce such a requirement in the absence of legislative guidance. More importantly, there is no evidence that the state had any idea it was undertaking such a vague and uncertain obligation when it elected to participate in the Medicaid program.

We find that the plaintiffs have failed to articulate a right that has been infringed by the conduct of the defendants for which this court could grant relief. The case will be dismissed for lack of standing, and the motion for class certification will be denied as moot.[17]

---

[17] In Foster v. Center Township of LaPorte County, the Seventh Circuit observed that "it is clear that, if [the plaintiff] lack[s] standing to bring the claim in question in her own right, she cannot qualify as a representative of a class purporting to raise the same claim." 798 F.2d 237, 244 (7th Cir. 1986) (remanding with directions to the district court to dismiss the claim at issue).

DATE:       February 25, 2002

ENTER:      _____
            John F. Grady, United States District Judge